**Slip Op. 12-102**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **PEER BEARING COMPANY – CHANGSHAN**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant, <br><br> and <br><br> **THE TIMKEN COMPANY**, <br><br> Defendant-intervenor. |

Before: Timothy C. Stanceu, Judge

Court No. 09-00052

## OPINION AND ORDER

[Ordering a second remand in litigation contesting the final results of a periodic administrative review of an antidumping duty order]

Date: August 2, 2012

*John M. Gurley*, *Diana Dimitriuc-Quaia*, and *Matthew L. Kanna*, Arent Fox LLP, of Washington, DC, for plaintiff.

*L. Misha Preheim*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With him on the brief were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel on the brief was *Joanna V. Theiss*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Terence P. Stewart* and *William A. Fennell*, Stewart and Stewart, of Washington, DC, for defendant-intervenor.

Stanceu, Judge: Plaintiff Peer Bearing Company-Changshan ("CPZ") brought this action in 2009 to contest a final determination ("Final Results") of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), in the twentieth periodic administrative review of an antidumping duty order on tapered roller bearings and parts thereof ("subject merchandise") from the People's Republic of China ("PRC" or "China").  Compl. ¶ 1 (Feb. 4, 2009), ECF No. 2; *see Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Admin. Review*, 74 Fed. Reg. 3,987 (Jan. 22, 2009) ("*Final Results*").[1]  CPZ is a Chinese producer of subject merchandise.  The twentieth review pertained to entries of subject merchandise made from June 1, 2006 to May 31, 2007 ("period of review" or "POR").  *Final Results*, 74 Fed. Reg. at 3,988.

Before the court is the determination Commerce issued on remand ("Remand Redetermination") in response to the court's order in *Peer Bearing Co.-Changshan v. United States*, 35 CIT __, 752 F. Supp. 2d 1353 (2011).  *Final Results of Redetermination Pursuant to Ct. Remand* (July 1, 2011), ECF No. 98 ("*Remand Redetermination*").  The court rejects the Remand Redetermination on two grounds.  First, Commerce did not recalculate surrogate values for certain production inputs despite the court's express directive that Commerce do so.  Second, the margin applied to CPZ was unlawful because Commerce, in determining that margin, impermissibly used an adverse inference in selecting from among the facts otherwise available.

---

[1] The scope of the order is "tapered roller bearings and parts thereof, finished and unfinished, from the PRC; flange, take up cartridge, and hanger units incorporating tapered roller bearings; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use." *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Admin. Review*, 74 Fed. Reg. 3,987, 3,988 (Jan. 22, 2009) ("*Final Results*").

## I. BACKGROUND

Background is provided in the court's opinion in *Peer Bearing*, 35 CIT at __, 752

F. Supp. 2d at 1358-59, and is supplemented herein.

### A.  The Administrative Review

During the review, CPZ took the position that all of its U.S. sales should be classified as

"constructed export price" ("CEP") sales, explaining that CPZ sold subject merchandise to an

unaffiliated U.S. importer, which immediately sold the merchandise to CPZ's U.S. affiliate, Peer

Bearing Company ("Peer"), for sale to the ultimate consumer.[2] *Letter from CPZ to the Sec'y of*

*Commerce* A-18-A-21 & exhibit A-1 (Oct. 3, 2007) (Admin. R. Doc. No. 5350).  The Timken

Company ("Timken"), a domestic producer of tapered roller bearings that participated in the

review, and defendant-intervenor in this case, argued to Commerce that CPZ's sales arrangement

may require that Commerce classify CPZ's sales as export price ("EP") sales rather than CEP

sales as reported by CPZ.  *Letter from Timken to the Sec'y of Commerce* 2-3 (Nov. 15, 2007)

_____

[2] The statute requires the International Trade Administration, U.S. Department of Commerce
("Commerce" or the "Department") to determine the "export price (or constructed export price)"
of each entry of subject merchandise.  19 U.S.C. § 1675(a)(2)(A)(i) (2006).  Export price is

> the price at which the subject merchandise is first sold (or agreed to be sold) before
> the date of importation by the producer or exporter of the subject merchandise
> outside of the United States to an unaffiliated purchaser in the United States or to an
> unaffiliated purchaser for exportation to the United States, as adjusted under
> subsection (c) of this section.

*Id.* § 1677a(a).  Constructed export price is

> the price at which the subject merchandise is first sold (or agreed to be sold) in the
> United States before or after the date of importation by or for the account of the
> producer or exporter of such merchandise or by a seller affiliated with the producer
> or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted
> under subsections (c) and (d) of this section.

*Id.* § 1677a(b).

(Admin. R. Doc. No. 5354).  Commerce then issued a supplemental questionnaire to CPZ on

April 2, 2008, requesting "any evidence of price negotiations between CPZ and its unrelated

customers in the United States," *Letter from Program Manager, AD/CVD Operations to CPZ* 1

(Apr. 2, 2008) (Admin. R. Doc. No. 5382), to which CPZ responded on April 29, 2008, stating

that no such negotiations took place and that "[t]he sales at issue are all CEP sales," *Letter from*

*CPZ to the Sec'y of Commerce* 2 (Apr. 29, 2008) (Admin. R. Doc. No. 5388).

On July 17, 2008, Commerce issued the preliminary results of the review ("Preliminary

Results"), in which it announced that "[in] accordance with section 772(b) of the Act [19 U.S.C.

§ 1677a(b)], we used CEP for CPZ's sales where CPZ sold subject merchandise to its affiliated

company in the United States, which in turn sold subject merchandise to unaffiliated U.S.

customers." *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, from the*

*People's Republic of China: Prelim. Results of Antidumping Duty Admin. Review*, 73 Fed. Reg.

41,033, 41,037 (July 17, 2008).  The Preliminary Results determined a preliminary margin of

59.41% for CPZ.  *Id.* at 41,039.

On July 28, 2008, the Department issued to CPZ a final supplemental questionnaire that

did not suggest any change in the Department's position that the U.S. price for CPZ's subject

merchandise should be determined by the CEP method.  *Letter from Program Manager,*

*AD/CVD Operations to CPZ* (July 29, 2008) (Admin. R. Doc. No. 5414).  In the case brief it

filed with Commerce on August 26, 2008, Timken renewed its argument on the need for

Commerce to adopt an EP methodology that would base U.S. price on CPZ's sales to the

unaffiliated importer.  *Case Br. of The Timken Company* 5-6 (Aug. 6, 2008) (Admin. R. Doc.

No. 5429).

On September 11, 2008, during the final phase of the review, both CPZ and Peer were

sold.  *Remand Redetermination* 18.  As part of this sale, a new corporation assumed the

responsibility for conducting the pre-sale antidumping litigation, including the current case.

*Letter from CPZ to the Sec'y of Commerce* exhibit 7 (Mar. 31, 2011) (Admin. R. Doc. No. 6120)

("*Mar. 31 Questionnaire Resp.*").

On January 22, 2009, Commerce issued the Final Results, which assigned to CPZ a final

antidumping duty margin of 92.84%.  *Final Results*, 74 Fed. Reg. at 3,989.  The Final Results

departed from the Preliminary Results in determining that CPZ's margin should be based on

CPZ's sales to the unaffiliated importer and not on Peer's sales to ultimate consumers.  *Id.*

at 3,988.  Commerce stated that it had "calculated the margins on an export price basis."  *Id.*

Because data on CPZ's sales were almost entirely absent from the record, Commerce calculated

CPZ's U.S. prices by modifying the price that CPZ reported for transactions between Peer and

the ultimate customer, using a factor derived from a small number of purchase orders pertaining

to transactions between CPZ and the unaffiliated importer, which accounted for fewer than 1%

of the sales transactions between CPZ and the unaffiliated importer and only a small fraction of

CPZ's models of subject merchandise.  *See Peer Bearing*, 35 CIT at __, 752 F. Supp. 2d at 1359.

Commerce described this method as relying on the "facts otherwise available" provision of the

Tariff Act of 1930 ("Tariff Act"), § 776, 19 U.S.C. § 1677e(a) (2006).  *Peer Bearing*, 35 CIT

at __, 752 F. Supp. 2d at 1361.

### B.  Proceedings Subsequent to the Administrative Review

Upon CPZ's contesting the Final Results, the court concluded that Commerce had not

determined the U.S. prices of CPZ's subject merchandise according to a lawful method.  *Peer*

*Bearing*, 35 CIT at __, 752 F. Supp. 2d at 1362-63.  The court ordered that Commerce, on

remand, "determine the U.S. prices on a constructed export price basis, whether or not it relies on

its authority to use facts otherwise available," unless Commerce were to reopen the record to

obtain additional price information "qualifying for use as starting prices for a determination of

export prices according to 19 U.S.C. § 1677a(a)." *Id.* at __, 752 F. Supp. 2d at 1376. The court

also ordered that Commerce "review, reconsider, and redetermine the surrogate values" for three

of CPZ's factors of production, "alloy steel wire rod, alloy steel bar, and scrap from the

production of cages." *Id.* at __, 752 F. Supp. 2d at 1377.

After a series of remand questionnaires and responses, Commerce filed the Remand

Redetermination on July 1, 2011. The Remand Redetermination assigned to CPZ a dumping

margin of 60.95%. *Remand Redetermination* 25.

## II. DISCUSSION

The court exercises subject matter jurisdiction under section 201 of the Customs Courts

Act of 1980, 28 U.S.C. § 1581(c) (2006). The court must hold unlawful any determination,

finding, or conclusion found to be unsupported by substantial evidence on the record or

otherwise not in accordance with law. Tariff Act, § 516A, 19 U.S.C. § 1516a(b)(1)(B)(i).

The 60.95% margin the Remand Redetermination assigned to CPZ was not based on

POR sales data. *Remand Redetermination* 1-2. Instead, Commerce selected this margin based

on what it termed "total AFA," *i.e.*, "total adverse facts available," *id.* at 25, a term Commerce

used to refer to the statutory authority to "use an inference that is adverse to the interests" of a

party who "failed to cooperate by not acting to the best of its ability" in responding to a request

for information, "in selecting from among the facts otherwise available," 19 U.S.C. § 1677e(b).

Commerce chose the 60.95% rate because this rate, which was applied to a respondent in a

remand redetermination stemming from the 1993/1994 administrative review of the order, was

"the highest rate on the record of any segment of this proceeding (outside of the rate at issue in

this remand) . . . ." *Remand Redetermination* 22.  Commerce stated that, because it did not

calculate an actual margin for CPZ, it had "reached no determination with respect to the SVs

[*i.e.*, surrogate values] for steel wire rod, steel bar, or steel scrap." *Id.* at 25.

    A.  Commerce Violated the Court's Order in Declining to Redetermine Surrogate Values for
        Alloy Steel Wire Rod, Alloy Steel Bar, and Scrap from the Production of Cages

        In its remand order, the court expressly directed Commerce to "redetermine the surrogate

values for alloy steel wire rod, alloy steel bar, and scrap from the production of cages." *Peer*

*Bearing*, 35 CIT at __, 752 F. Supp. 2d at 1377.  Commerce intentionally declined to do so on

the reasoning that it was not calculating a margin for CPZ, having chosen instead to assign CPZ

a rate based solely on what it termed "total AFA." *Remand Redetermination* 25.  The court's

remand order did not allow Commerce discretion as to whether to redetermine the surrogate

values, regardless of whether and how these values would be used.

        For reasons discussed later in this Opinion and Order, the court rejects the reasoning that

Commerce, on the record before it, was authorized by law to apply what it termed "total AFA."

Even were that not the case, the court still would conclude that Commerce acted improperly in

deciding it was free to disregard the court's directive, which was unambiguous in requiring

Commerce to redetermine the three surrogate values and, moreover, required a redetermination

upon remand "that complies in all respects with this Opinion and Order."[3] *Peer Bearing*, 35 CIT

at __, 752 F. Supp. 2d at 1376-77.  If, as it appears, Commerce believed it an unwise use of its

---

[3] The court's order also directed Commerce to redetermine a margin for CPZ "based on
redetermined U.S. prices of CPZ's subject merchandise . . . ." *Peer Bearing Co.-Changshan v.*
*United States*, 35 CIT __, __, 752 F. Supp. 2d 1353, 1376 (2011).  The determination the
Department reached on remand does not fulfill this directive. *Final Results of Redetermination*
*Pursuant to Ct. Remand* (July 1, 2011), ECF No. 98.

resources to redetermine surrogate values it had no intention of using when assigning a revised

margin to CPZ, defendant could have brought that view to the court's attention in a motion

seeking a modification of the order issued in *Peer Bearing*.  Commerce was not free to resort to

the simple expedient of declining to comply.

A party's intentional failure to comply with an order of this Court is a serious matter,

regardless of the party's motivation.  The order issued herewith directs defendant to file, prior to

the filing of a second remand redetermination, a submission addressing the Department's failure

to comply with the court's directive, as set forth in the *Peer Bearing* order, 35 CIT at __, 752

F. Supp. 2d at 1376-77.  In that submission, defendant shall inform the court of measures

defendant will take to ensure that the Department's officials understand, and comply with fully,

their obligation to obey all orders the court issues in the remainder of this proceeding.  The court

will consider this submission in determining whether to issue a further order with respect to the

Department's intentional noncompliance.

### B.  The Department's Use of an Adverse Inference Was Unlawful

In assigning CPZ a margin based on "total AFA," Commerce invoked its authority under

19 U.S.C. § 1677e(a), which allows use of "facts otherwise available" in certain circumstances,

and § 1677e(b), which provides that Commerce "may use an inference that is adverse to the

interests" of a party "in selecting from among the facts otherwise available" if that party "failed

to cooperate by not acting to the best of its ability to comply with a request for information" from

Commerce.  In support of its decision to use facts otherwise available under § 1677e(a),

Commerce found, specifically, that "CPZ did not submit the requested documentation regarding:

1) price negotiations/communications between itself and the importer; 2) contracts or agreements

between the two entities; 3) ownership information regarding the importer; or 4) payment

between the two parties." *Remand Redetermination* 17.  In addressing the question of why it was

using "facts otherwise available," Commerce stated in the Remand Redetermination that

> In accordance with sections 776(a)(2)(A) through (C) [19 U.S.C. § 1677e(a)(2)(A) -
> (C)], by not responding to the Department's requests for additional information with
> respect to its sales process and by not providing the Department with the requested
> EP sales data, we find that CPZ withheld information requested, failed to provide the
> requested information in a timely manner, and significantly impeded the remand
> proceeding.

*Id.* at 18.

The Department invoked the authority to use an adverse inference based on a finding that

CPZ did not act to the best of its ability in responding to the Department's requests for two

categories of information.  Commerce found, specifically, that CPZ did not act to the best of its

ability to comply with the request for transaction and price data for the sales between CPZ and

the unaffiliated U.S. importer.  *Id.* at 20.  Commerce also found that CPZ did not act to the best

of its ability to submit "documents evidencing negotiations" between CPZ and the unaffiliated

importer.  *Id.* at 18.

The court concludes that Commerce erred in invoking its "adverse inference" authority

with respect to each of the two categories of information that Commerce identified in the

Remand Redetermination.

### 1.  CPZ's Failure to Provide Transaction and Pricing Data for Sales between CPZ and the Unaffiliated Importer Did Not Constitute a Failure to Cooperate

During the remand proceeding, Commerce requested in its first "Remand Supplemental

Questionnaire" that CPZ provide "a revised Section C questionnaire response and U.S. sales

database for all sales of subject merchandise which occurred during the POR between CPZ" and

the unaffiliated importer.[4]  *Letter from Program Manager, AD/CVD Operations to CPZ* 4

(Feb. 16, 2011) (Admin. R. Doc. No. 6083) ("*First Remand Supplemental Questionnaire*").  In

its response to this questionnaire, CPZ informed Commerce that "[d]espite its best efforts, CPZ

is unable to provide the requested Section C database."  *Letter from CPZ to the Sec'y of

Commerce* 1 (Mar. 10, 2011) (Admin. R. Doc. No. 6104) ("*Mar. 10 Questionnaire Resp.*").  CPZ

explained that the party litigating on behalf of CPZ had "requested such information from CPZ's

new owners" but that the new owners "informed us that CPZ has not maintained the information

and documentation that would allow it to prepare a Section C EP database."  *Id.*  Commerce sent

a second questionnaire during the remand proceeding (the "Second Remand Supplemental

Questionnaire"), dated March 16, 2011.  *Letter from Program Manager, AD/CVD Operations to

CPZ* (Mar. 16, 2011) (Admin. R. Doc. No. 6115) ("*Second Remand Supplemental

Questionnaire*").  In it, Commerce repeated its request, asking that CPZ report the "actual prices

paid between [the unaffiliated importer] and CPZ and the accompanying data."  *Id.*  CPZ replied

that it was "unable to supply this information," despite making "multiple requests to the current

owner of CPZ and Peer . . . ."  *Mar. 31 Questionnaire Resp.* 5.  CPZ attached a letter from

counsel for the new ownership stating that the records being sought were unavailable.  Pl. Peer

Bearing Co.-Changshan's Comments on Def.'s Redetermination on Remand 13 (Aug. 2, 2011),

ECF No. 106 (Pl.'s Comments").

     Commerce made two findings in support of its conclusion that CPZ did not act to the best

of its ability in responding to the request for the data on the sales between CPZ and the

unaffiliated importer.  First, Commerce found that CPZ, upon receiving the requests for these

---

[4] "Section C" refers to the portion of the Department's questionnaire that requires reporting of a
respondent's U.S. sales.

data in the remand proceeding, did not do all it could to obtain the data from the new owners

who had acquired CPZ and Peer and inferred that CPZ intentionally withheld the requested sales

information during the remand proceeding in an attempt to obtain a better margin.  *See Remand*

*Redetermination* 19-20.  Second, the Department found that CPZ, as the party originally in

possession of the data, did not meet what the Department considered to be CPZ's burden of

maintaining those data prior to the Department's information request.  *Id.* at 19.  The court

concludes that the record lacks any evidence that CPZ could have done more to obtain the sales

data from the new owners once Commerce requested that information.  The court, therefore,

rejects both the finding that CPZ could have done more in the remand proceeding and the

Department's inference that CPZ withheld the information intentionally.  The court further

concludes that the Department erred in using an adverse inference based on a presumption that

CPZ had a duty to preserve the sales data throughout the time period prior to the Department's

issuing the first request for those data during the remand proceeding.

    The Department's finding that CPZ did not do all it could to obtain the data during the

remand proceeding lacks any evidentiary support.  To invoke § 1677e(b), Commerce must find

that a party has failed to provide requested information and that a party did not do the maximum

it was able to do to provide the requested information.  *Nippon Steel Corp. v. United States*,

337 F.3d 1373, 1382 (Fed. Cir. 2003) ("Before making an adverse inference, Commerce must

examine respondent's actions and assess the extent of respondent's abilities, efforts, and

cooperation in responding to Commerce's requests for information.").  In this case, there is no

record evidence that the EP-related sales data sought by Commerce still existed as of the

issuance of the first remand questionnaire on February 16, 2011, and such evidence as exists on

the record suggests the opposite.  CPZ stated in two questionnaire responses that the data on

CPZ's sales to the unaffiliated importer were no longer available.  *Mar. 10 Questionnaire Resp.* 1 ("CPZ has not maintained the information and documentation that would allow it to prepare a Section C EP database"); *Mar. 31 Questionnaire Resp.* 7 ("[T]he new owners of CPZ and Peer apparently have not kept certain files from the 2006-2007 review . . .").  The record contains evidence, in the form of the aforementioned letter from counsel for the current owners, indicating that no such documents were available to the current owners of CPZ.  Pl.'s Comments 13.  The letter explains that the personnel who originally would have compiled the records are no longer with the acquired companies, most of the staff having been laid off during the recession.  *Id.*  It also explains that the records pertained to sales made over six years ago by companies unrelated to the acquiring company and were, for the most part, kept manually.  *Id.*

Because the finding that CPZ could have done more to obtain the sales data during the remand proceeding is invalid for lack of supporting evidence, the Department's inference that CPZ deliberately withheld the information in the hope of obtaining a better margin was also impermissible.  The Department stated in the Remand Redetermination that "[by] failing to submit pricing data between itself and the importer, CPZ has ensured that the only prices on the record are those that the Department has determined are not the appropriate prices for purposes of calculating CPZ's dumping margin."  *Remand Redetermination* 20.  Inferring that CPZ deliberately withheld the data, the Department further stated that "CPZ failed to cooperate in this remand proceeding despite the fact that the Department had last applied to it a rate of 60.95% as part of the PRC-wide entity in the review immediately preceding the instant review," adding that "[t]hus, we find it reasonable to infer that CPZ's actual dumping margin would not have been less than 60.95% because, if that were the case, CPZ would have produced current information showing the margin to be less."  *Id.* at 24 (internal quotation omitted).  Commerce is permitted to

draw reasonable inferences, but on this record the inference that CPZ intentionally withheld information during the remand proceeding is not a reasonable one.

Other reasoning that Commerce offered in support of its adverse inference is also flawed. Commerce questioned the veracity of the statements CPZ made on efforts to obtain the sales data from the new owners, stating in the Remand Redetermination that "[s]ubsequent to this transfer of ownership, CPZ was able to file its own questionnaire response in the 2008/2009 review while relying on the cooperation of the new owners for documentation" and reaching the finding that "while CPZ has noted its ability to cooperate with the new owners in the context of submitting sufficient questionnaire responses in subsequent segments of this antidumping proceeding, it has not done so for the instant segment." *Id.* at 18-19.  The fact of CPZ's providing information obtained from the new owners in a subsequent review of the order does not establish or suggest that CPZ lacked the willingness to cooperate with the new owners during the remand proceeding. The Department also makes a point of informing the court that "CPZ was provided an ample amount of time to submit a response to the Department's requests for information, and the Department liberally granted all the extensions requested by CPZ." *Id.* at 20.  Because the record lacks any evidence that the data Commerce sought existed on or after February 16, 2011 (and instead contains evidence suggesting the contrary), Commerce had no evidentiary basis to presume that it would have received the sales data if only CPZ had been more diligent, or more cooperative with the new owners, during the remand proceeding.

The Department also erred in using an adverse inference on the reasoning that CPZ failed to maintain the sales data in the time period prior to CPZ's receiving, during the remand proceeding, the Department's request for those data. *Id.* at 19.  CPZ's failure to maintain those

data is not a sufficient ground for the Department's use of an adverse inference in the unique

situation presented by this case.

On its face, § 1677e(b) does not authorize the use of an adverse inference on the premise

that a party has a duty to keep records in anticipation that Commerce will request such records in

the future.  And plain meaning and logic would suggest that it is not possible for a party to act

"to the best of its ability to *comply* with a *request* for information" that it has yet to receive.

19 U.S.C. § 1677e(b) (emphasis added).  Nevertheless, the U.S. Court of Appeals for the Federal

Circuit ("Court of Appeals"), in *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d

1330 (Fed. Cir. 2002), identified a circumstance in which a party may be found to have failed to

cooperate under § 1677e(b) even though submission of requested information is no longer

possible by the time Commerce issues its request.  During the review at issue in that case,

plaintiff Ta Chen failed to submit requested records of the sales of Sun Stainless, Inc. ("Sun"), a

U.S. distributor of Ta Chen's subject steel pipe that Commerce determined to be affiliated with

Ta Chen during the period of review, which was December 1994 through November 1995.  *Id.*

at 1332-33.  In July 1995, during the period of review, Sun had been sold to parties who later

refused to cooperate with Ta Chen, declining to provide the requested information.  *Id.*  The

Court of Appeals characterized the decision of the Court of International Trade that it affirmed

upon appeal as noting that, "while Ta Chen may have had reason to argue it was not affiliated

with Sun under the changing definitions of 'affiliated party,' it was nevertheless on notice as

early as July 1994 that its relationship with Sun was at issue and that Sun's sales might be later

construed as constructed export price sales."  *Id.* at 1334 (citing *Ta Chen Stainless Steel Pipe,*

*Inc. v. United States*, 24 CIT 841, 844 (2000)).

This case differs from *Ta Chen* in an important respect.  In *Ta Chen*, Commerce requested the sales records of Sun during the administrative review, before requesting those records again during a subsequent remand proceeding.  Here, Commerce never requested that CPZ submit the missing EP-related sales data during the administrative review at issue in this litigation.  The Final Results concluded that the U.S. price of CPZ's subject merchandise would be determined absent those data, a decision to which administrative finality attached upon publication.  *Ta Chen* did not involve the question of whether Commerce may draw an adverse inference under § 1677e(b) for a party's failure to provide information that Commerce requested for the first time during a judicial remand proceeding.  Here, Commerce repeatedly decided not to request the data at issue during the administrative review.  The court concludes that neither the plain meaning of § 1677e(b) nor the holding in *Ta Chen* authorized Commerce to use an adverse inference as it did in the Remand Redetermination, and the court is aware of no other authority under which Commerce could have done so.

Reiterating a point Commerce made in the Remand Redetermination, defendant comments that "it was CPZ that initiated a lawsuit challenging Commerce's use of EP in the *Final Results*" and that CPZ, therefore, "had the responsibility to 'maintain access to any and all information that might have been relevant to the review and any subsequent litigation.'"  Def.'s Resp. to Pl.'s Comments Regarding the Remand Redetermination 19 (Aug. 16, 2011), ECF No. 110 (quoting *Remand Redetermination* 19 (citing *Abitibi-Consolidated, Inc. v. United States*, 30 CIT 714, 723, 437 F. Supp. 2d 1352, 1361 (2006))).  As the court has discussed, however, the holding in *Ta Chen* does not authorize the adverse inference at issue in this case.  Nor is the adverse inference drawn in the Remand Redetermination supported by the reasoning upon which the Court of Appeals decided *Ta Chen*.  Implicitly acknowledging that an obligation to maintain

records prior to receipt of an information request does not expressly appear in 19 U.S.C.

§ 1677e(b), the Court of Appeals stated in *Ta Chen* that

> [w]hile it is true that a respondent to a Commerce inquiry only has an obligation to
> produce data requested by Commerce, *see* 19 U.S.C. § 1677e(b), it is reasonable in
> this case for Commerce to expect Ta Chen to preserve its records in the event that
> Commerce itself would request them, which it actually did in October 1996.

*Ta Chen*, 298 F.3d at 1336.  Under the unique circumstances of this administrative review and

the remand proceeding, it is not reasonable for Commerce to expect CPZ to have preserved those

data for so long a period of time.  Commerce issued the Final Results on January 22, 2009.  *Final

Results*, 74 Fed. Reg. at 3,987.  The Department's first request for the data occurred on

February 16, 2011, more than two years after the review was completed.  During the course of

the review, Commerce had rejected the requests of defendant-intervenor Timken—made both in

the preliminary and the final phases of the review—that Commerce obtain from CPZ the data

from the sales between CPZ and the importer.  *Peer Bearing*, 35 CIT at __, 752 F. Supp. 2d

at 1357.  Commerce thus gave CPZ (and Timken as well) every indication that it had no

intention of seeking the data it now views as essential to determining U.S. price.  Once the

review was completed, Commerce lacked statutory authority to issue questionnaires to obtain

additional information.  Defendant's argument would hold that CPZ reasonably should have

expected that Commerce would request the EP-related data in a future remand proceeding.

However, a remand proceeding in which the record is reopened so that Commerce may obtain

information not previously sought is not an ordinary occurrence.  Judicial review ordinarily is

conducted upon the agency record compiled for the final determination being challenged.  Both

the prospect of a remand and the possibility that such a remand would involve reopening of the

record for the purpose of obtaining data Commerce previously decided not to seek were, at the

time of publication of the Final Results, matters of speculation.

The Department's citation in the Remand Redetermination to *Abitibi-Consolidated, Inc.*, 30 CIT at 723, 437 F. Supp. 2d at 1361, which defendant noted in its comment, is also unavailing. The cited language in *Abitibi* is *dicta*, discussing hypothetically the possibility that a failure to maintain records could result in the Department's using an adverse inference. *Id.* at 723, 437 F. Supp. 2d at 1361. *Abitibi*, which involved a question of jurisdiction under 28 U.S.C. § 1581(i), does not stand for the principle that Commerce is free to use an adverse inference in circumstances such as those present in this remand proceeding.

Finally, allowing the adverse inference Commerce used in the Remand Redetermination would not accord with the purpose of § 1677e(b), which is to encourage parties to cooperate fully with a request for information from Commerce or the U.S. International Trade Commission. *See Uruguay Round Agreements Act, Statement of Administrative Action*, H.R. Rep. No. 103-316, Vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199. As the Court of Appeals has held, the purpose of the provision is not to authorize punitive action. *F. Lli De Cecco Di Filippo fara S. Martino S.p.A. v.United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("The purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."). Permitting Commerce to invoke its authority to use an adverse inference where the need to maintain the data is not reasonably foreseeable would not further the statutory purpose.

### 2. CPZ's Failure to Provide Documentation Evidencing Negotiations Between CPZ and the Unaffiliated Importer Did Not Constitute a Failure to Cooperate

In the February 16, 2011 Remand Supplemental Questionnaire, Commerce asked a series of questions directed to the "process" by which the sales between CPZ and the importer were negotiated. *First Remand Supplemental Questionnaire* 3. Among the questions was question 2c, "[a]re the prices paid to [the importer] and from [the importer] negotiated in advance or on a

transaction specific basis?", and the request that CPZ "[p]rovide evidence of these negotiations."
*Id.*  CPZ submitted two responses to the Remand Supplemental Questionnaire, dated March 3
and March 10, 2011.  *Letter from CPZ to the Sec'y of Commerce* (Mar. 3, 2011) (Admin. R. Doc.
No. 6096) ("*Mar. 3 Questionnaire Resp.*"); *Mar. 10 Questionnaire Resp.*  In the March 3
questionnaire response, CPZ responded that "[t]here were no negotiations" and explained that
Peer instructed the importer as to what the prices were, that the importer "did not order the
subject merchandise from CPZ; rather Peer submitted purchase order[s] to CPZ and [the
importer] simultaneously," setting both the price from Peer to the customer and CPZ's sales
price to the importer.  *Mar. 3 Questionnaire Resp.* 4.  CPZ informed Commerce that the importer
took title to the merchandise but not possession, the product having been shipped directly from
CPZ to Peer.  *Id.*  CPZ also stated that "[t]he invoices corresponding to the purchase orders on
the record reflect the same terms of sale as in Peer's purchase orders."  *Id.*  In response to related
questions in the February 16, 2011 questionnaire, CPZ told Commerce that the importer was not
free to reject or modify any terms of the transaction, did not do so during the POR, and "was
simply paid a fee for its services."  *Id.* at 6.  Similarly, Commerce asked, in question 3a of the
February 16, 2011 questionnaire, that CPZ "[p]lease explain which parties agree to the price
between CPZ and the importer of record, describe the process by which this agreement is
reached, and provide documentary evidence to support your response."  *First Remand
Supplemental Questionnaire* 4.  CPZ answered that Peer set the prices, that "CPZ had to agree
with Peer as to the price set," and that a sample purchase order on the record, issued by Peer to
the importer, also indicated the price the importer would charge Peer.  *Mar. 3 Questionnaire
Resp.* 6.

Commerce sent a second questionnaire during the remand proceeding (the "Second Remand Supplemental Questionnaire"), dated March 16, 2011. *Second Remand Supplemental Questionnaire*. Commerce stated that it found "CPZ's responses to be deficient," including, presumably, CPZ's responses to the aforementioned questions 2c and 3a in the initial remand questionnaire. *Id.* at 1. In the second questionnaire, Commerce requested "[e]vidence regarding price or contract negotiations between [the importer] and CPZ (question 2c)" and "[a]dditional evidence supporting the establishment, communication, and acceptance of prices [the importer] paid CPZ (question 3a)." *Id.* One reason Commerce gave for its finding of insufficiency was that "CPZ provided no additional evidence or data in response to these questions but instead cited limited documents already on the record of the proceeding." *Id.* In requesting the evidence again, Commerce instructed that "[to] the extent that CPZ is unable to obtain any of this information, please provide an explanation and submit evidence that CPZ has exhausted its best efforts to produce it." *Id.*

CPZ filed its response to the Second Remand Supplemental Questionnaire on March 31, 2011, stating that "[t]here is no evidence of price or contract negotiations between [the importer] and CPZ as there was [*sic*] none." *Mar. 31 Questionnaire Resp.* 3. The response also argued that "CPZ has not been unresponsive" and that "CPZ cannot prove 'negotiations' between CPZ and [the importer] when there were no such negotiations." *Id.* at 6. CPZ added that "[to] the contrary, it supplied information throughout the review confirming that Peer controlled all aspects of the transactions." *Id.* CPZ also filed documentation of two "sales traces" from the Department's 2007-08 verification of CPZ, which CPZ characterized as showing that the importer "was essentially not involved in negotiations with CPZ and that CPZ viewed Peer as the customer." *Id.* at 5, exhibits 4-5.

The answers CPZ gave in response to requests for documents evidencing negotiations between CPZ and the importer raise issues that Commerce could have pursued by asking further questions.  The record shows, however, that in the second questionnaire it sent during the remand proceeding, Commerce did not ask such further questions.  That questionnaire limited the request for evidence of negotiations to negotiations between CPZ and the importer.  Commerce did not ask CPZ to explain, for example, how or when the importer first entered into the arrangement with Peer, which, according to CPZ, dictated the terms.  Instead, confining its final request for evidence of negotiations to negotiations between CPZ and the importer, Commerce based its determination of a failure to cooperate on the fact that CPZ did not submit such evidence.  From the Department's questions and CPZ's responses, it appears that CPZ construed the Department's final request for documents evidencing negotiations between CPZ and the importer to involve *only* negotiations between these two parties and, possibly, only negotiations that occurred during the POR.  CPZ was induced to respond repeatedly that there were no such negotiations as the Department had described.  It is possible that CPZ responded in this way out of a desire to convince the Department that the "sales" between CPZ and the importer were merely formalities and thereby garner support for CPZ's argument that use of the CEP method was appropriate.  Arguably, the answers CPZ gave to the "sales process" questions (*i.e.*, questions 2c and 3a) in its questionnaire responses were not as elucidating as they might have been on the overall negotiation process involving all three parties.  The court cannot conclude, however, that Commerce was correct in finding that CPZ had been unresponsive in answering questions on the negotiating process.  The court cannot overlook the obvious point that the Department's dissatisfaction with the answers was a result of the narrowly circumscribed manner in which the Department drafted its questions.

Moreover, the Department's final questionnaire during the remand proceeding inadequately explained what the Department considered to be deficient in the earlier response, objecting principally that the earlier response cited only limited documents already on the record. *See Second Remand Supplemental Questionnaire*; 19 U.S.C. § 1677m(d) (requiring Commerce to notify the submitter of the "nature of the deficiency").  For these reasons, the court does not find substantial record evidence to support the Department's finding that CPZ's responses to the requests for documents evidencing negotiations were insufficient.  Fairness requires that Commerce, before invoking an adverse inference, must have communicated its information requests clearly and adequately.  A party's failing to take actions never requested cannot be the basis for a finding of a lack of cooperation under § 1677e(b).  *See Shantou Red Garden Foodstuff Co. v. United States*, 36 CIT __, __, 815 F. Supp. 2d 1311, 1323 (2012).

The Remand Redetermination acknowledged that "in regards to documents evidencing negotiations between the two parties, we find it plausible that there may be no such documents, *e.g.*, negotiations could be implemented in person, by phone, *etc*."  *Remand Redetermination* 19. The reason the Department offered, in the next sentence, as to why it nevertheless concluded that CPZ had been unresponsive was as follows:  "However, CPZ's overall portrayal of the nature of its agreement with the importer remains deficient, as it has not materially contributed to the record such that the issues the Department identified in the *Final Results*, and detailed above, have been clarified."  *Id.*  This vague rationale is not a statement of a clear finding of insufficiency, and it cannot suffice as an evidentiary ground on which Commerce could use an adverse inference.  Moreover, in alluding to issues that have not been "clarified," the rationale is misguided.  The questions and responses on the negotiation process between CPZ and the importer were relevant only to the Department's determining whether the transactions between

CPZ and the importer were "sales" between unrelated parties.  The record contained ample

evidence to establish that CPZ and the importer were not related parties.  It also contained ample

evidence that actual sales occurred between these two parties, including, for example, the

questionnaire response by CPZ informing Commerce that that the importer took title to the

merchandise.  In deciding that it must use the EP method, Commerce, rejecting CPZ's arguments

urging use of the CEP method, reached the determination that actual sales between CPZ and the

unrelated importer occurred, and it did so with no need for, and no explicit resort to, the use of

alternate information as facts otherwise available under § 1677e(a).  *See Remand*

*Redetermination* 11 (stating that Commerce reached its determination "on the record as it

currently stands").  Because the Department readily found that the record established actual sales

between the CPZ and the unrelated importer for purposes of using the EP method to determine

U.S. price, the court finds inadequate the Department's reasoning that an adverse inference is

warranted on the ground that CPZ "has not materially contributed to the record such that the

issues the Department identified in the *Final Results*, and detailed above, have been clarified."

*Id.* at 19.

In summary, the record does not contain evidence sufficient to support the Department's

use of an adverse inference in response to CPZ's answers to the Department's requests for

documentation on the negotiation process involving CPZ and the unaffiliated importer.

### III.  CONCLUSION AND ORDER

Commerce acted unlawfully by failing to recalculate the surrogate values addressed in the

court's first Opinion and Order in this case.  On remand, Commerce must recalculate those

surrogate values.  The court also will order defendant, in a separate submission, to inform the

court of measures defendant will take to ensure that Commerce complies fully with all orders the court issues in the remainder of this proceeding.

The court concludes, further, that Commerce acted contrary to law in using an adverse inference in redetermining a weighted-average dumping margin for CPZ.  On remand, Commerce must redetermine the U.S. prices of the subject merchandise according to a lawful method.

Upon considering all submissions made herein, and upon due deliberation, it is hereby

**ORDERED** that the *Final Results of Redetermination Pursuant to Ct. Remand* (July 1, 2011), ECF No. 98, filed by the International Trade Administration, U.S. Department of ("Commerce" or the "Department"), be, and hereby are, set aside as contrary to law; it is further

**ORDERED** that defendant must file a submission within thirty (30) days of the date of this Opinion and Order addressing the Department's failure to comply with the directive to determine surrogate values contained within the order in *Peer Bearing Co.-Changshan v. United States*, 35 CIT __, 752 F. Supp. 2d 1353 (2011), which submission shall inform the court of measures defendant will take to ensure that the Department complies fully with all orders the court issues in the remainder of this proceeding; it is further

**ORDERED** that Commerce shall issue upon remand another redetermination ("Second Remand Redetermination") that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that Commerce, in preparing the Second Remand Redetermination in accordance with this Opinion and Order, shall review, reconsider, and redetermine the surrogate values for alloy steel wire rod, alloy steel bar, and scrap from the production of cages in accordance with the court's prior opinion and order in this case; it is further

**ORDERED** that Commerce, in preparing the Second Remand Redetermination in accordance with this Opinion and Order and the court's prior opinion and order in this case, shall determine the U.S. prices for CPZ's subject merchandise according to a lawful method; it is further

**ORDERED** that Commerce shall file the Second Remand Redetermination no later than sixty (60) days from the date of this Opinion and Order; it is further

        **ORDERED** that plaintiff and defendant-intervenor shall be allowed thirty (30) days from defendant's filing of the Second Remand Redetermination to file any comments thereon; and it is further

        **ORDERED** that defendant shall be allowed fifteen (15) days from the filing of plaintiff's comments or the filing of defendant-intervenor's comments, whichever is later, in which to file any rebuttal to such comments.

                                                          /s/ Timothy C. Stanceu
                                                          Timothy C. Stanceu
                                                          Judge


Dated: August 2, 2012
          New York, New York