Slip Op. 13-116

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **PEER BEARING COMPANY – CHANGSHAN**,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES**,<br><br>Defendant,<br><br>and<br><br>**THE TIMKEN COMPANY**,<br><br>Defendant-Intervenor. | Before: Timothy C. Stanceu, Judge<br><br>Court No. 09-00052 |

## OPINION

[Sustaining a redetermination the U.S. Department of Commerce issued in response to the court's remand order in litigation contesting the final results of a periodic administrative review of an antidumping duty order on tapered roller bearings and parts thereof from the People's Republic of China]

Date: August 30, 2013

*John M. Gurley* and *Diana Dimitriuc-Quaia*, Arent Fox LLP, of Washington, DC, for plaintiff.

*L. Misha Preheim*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the brief were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *Joanna V. Theiss*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC.

*William A. Fennell*, *Terence P. Stewart*, and *Stephanie R. Manaker*, Stewart and Stewart, of Washington, DC, for defendant-intervenor.

Stanceu, Judge: Plaintiff Peer Bearing Company-Changshan ("CPZ") brought this action to contest a final determination ("Final Results") of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), in the twentieth periodic administrative review of an antidumping duty order on tapered roller bearings and parts thereof ("subject merchandise") from the People's Republic of China ("PRC" or "China").  Compl. ¶ 1 (Feb. 4, 2009), ECF No. 2; *see Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Admin. Review*, 74 Fed. Reg. 3,987 (Jan. 22, 2009) ("*Final Results*").[1]  The twentieth administrative review pertained to entries of subject merchandise made from June 1, 2006 through May 31, 2007 ("period of review" or "POR").  *Final Results*, 74 Fed. Reg. at 3,988.

Before the court is the second of two remand redeterminations that Commerce has issued in this case ("Second Remand Redetermination").  The Second Remand Redetermination responds to the court's order in *Peer Bearing Co.-Changshan v. United States*, 36 CIT __, 853 F. Supp. 2d 1365 (2012) ("*Peer Bearing II*").  *Final Results of Redetermination Pursuant to Ct. Remand* (Oct. 2, 2012), ECF No. 124 ("*Second Remand Redetermination*").  For the reasons discussed in this Opinion and Order, the court sustains the Second Remand Redetermination.

---

[1] The scope of the order is "tapered roller bearings and parts thereof, finished and unfinished, from the [People's Republic of China]; flange, take up cartridge, and hanger units incorporating tapered roller bearings; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use." *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Admin. Review*, 74 Fed. Reg. 3,987, 3,988 (Jan. 22, 2009).

## I. BACKGROUND

Background information on this litigation is presented in the court's previous opinions

and is supplemented briefly herein.  *See Peer Bearing II*, 36 CIT at __, 853 F. Supp. 2d

at 1367-69; *Peer Bearing Co.-Changshan v. United States*, 35 CIT __, __, 752 F. Supp. 2d 1353,

1358-60 (2011) ("*Peer Bearing I*").

The Final Results assigned to CPZ an antidumping duty margin of 92.84%.  *Final*

*Results*, 74 Fed. Reg. at 3,989.  In *Peer Bearing I*, the court held that Commerce, in attempting to

determine the U.S. prices of CPZ's subject merchandise on an export price ("EP") basis

according to its selection of "facts otherwise available" under section 776(a) of the Tariff Act

of 1930 ("Tariff Act" or the "Act"), 19 U.S.C. § 1677e(a)[2], had not determined these U.S. prices

according to a lawful method.  *Peer Bearing I*, 35 CIT at __, 752 F. Supp. 2d at 1362-63.  The

court ordered Commerce, on remand, to "determine the U.S. prices on a constructed export price

["CEP"] basis, whether or not it relies on its authority to use facts otherwise available," unless

Commerce decided to reopen the record to obtain additional price information "qualifying for

use as starting prices for a determination of export prices according to 19 U.S.C. § 1677a(a)."  *Id.*

at __, 752 F. Supp. 2d at 1376.  The court also ordered Commerce to "review, reconsider, and

redetermine the surrogate values" for three of CPZ's factors of production, "alloy steel wire rod,

alloy steel bar, and scrap from the production of cages."  *Id.* at __, 752 F. Supp. 2d at 1377.

In preparing the first remand determination in response to the court's order in *Peer*

*Bearing I*, Commerce reopened the record by issuing a series of remand questionnaires to CPZ in

an effort to obtain price information from which it could determine U.S. prices on an EP basis.

*Peer Bearing II*, 36 CIT at__, 853 F. Supp. 2d at 1369.  Concluding that CPZ had not provided

_____

[2] Unless otherwise indicated, all statutory citations herein are to the 2006 edition of the
U.S. Code.

the necessary export price information and had not acted to the best of its ability to respond to

the Department's remand questionnaires, Commerce relied on the authority provided by

section 776(b) of the Tariff Act, 19 U.S.C. § 1677e(b), to "use an inference that is adverse to the

interests" of a party who "failed to cooperate by not acting to the best of its ability" in

responding to a request for information. *Id.* (citations omitted). Commerce resorted to a method

it termed "total adverse facts available" to determine a new margin for CPZ. *Id.* That margin, as

set forth in the first remand redetermination, was 60.95%. *Id.* Commerce reasoned that its use

of this method obviated the need for it to redetermine any of the three surrogate values at issue in

this litigation. *Id.*, 36 CIT at __, 853 F. Supp. 2d at 1370.

 Rejecting the first remand results, the court held that Commerce erred in failing to

redetermine the surrogate values in response to the court's remand order. *Id.*, 36 CIT at __,

853 F. Supp. 2d at 1370-78. The court also held that Commerce erred in finding that CPZ had

not acted to the best of its ability in responding to the Department's questionnaires and therefore

also erred in resorting to an adverse inference. *Id.* The court ordered Commerce, *inter alia*, to

redetermine the three surrogate values at issue and to "redetermine the U.S. prices for CPZ's

subject merchandise according to a lawful method." *Id.*, 36 CIT at __, 853 F. Supp. 2d

at 1378-79. In response, Commerce filed the Second Remand Redetermination on

October 2, 2012, in which it determined a recalculated margin of 6.52% for CPZ. *Second*

*Remand Redetermination* 17. CPZ commented in favor of the Second Remand Redetermination.

Pl. Peer Bearing Co.-Changshan's Comments on Def.'s Second Redetermination on Remand

(Nov. 1, 2012), ECF No. 127 ("CPZ's Comments"). Timken filed a comment submission in

opposition. Comments on Final Results of Second Redetermination Pursuant to Ct. Remand

(Nov. 5, 2012), ECF No. 128 ("Timken's Comments").

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises subject matter jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c).  The court must hold unlawful any determination, finding, or conclusion found to be unsupported by substantial evidence on the record or otherwise not in accordance with law.  Tariff Act, § 516A, 19 U.S.C. § 1516a(b)(1)(B)(i).

### B.  Redetermination of U.S. Prices for CPZ's Subject Merchandise

In the Second Remand Redetermination, Commerce stated that "[f]or the reasons discussed in the [*first*] *Remand Redetermination*, the Department continues to find that EP is the appropriate basis to determine CPZ's U.S. price." *Second Remand Redetermination* 10 (citation omitted).  Commerce also found, as it had in the first remand redetermination, that "the record lacks the price data necessary to calculate CPZ's U.S. price on an EP basis and, thus, we are unable to calculate CPZ's EP margin in accordance with section 772(a) of the Act," 19 U.S.C. § 1673a(a).  *Id.*  The Second Remand Redetermination further concluded that "the record contains all transaction and expense information necessary to calculate CPZ's U.S. price on a CEP basis" and that "[t]hese are the only data on the record sufficient for calculating U.S. price in accordance with the Act and the Court's orders" in *Peer Bearing I* and *Peer Bearing II*.  *Id.* (citation omitted).  Commerce concluded by stating that "because necessary information is not on the record, as non-adverse facts available, we have recalculated CPZ's dumping margin using a U.S. price based on the CEP information."[3]  *Id.* (citations omitted).

---

[3] In using the term "non-adverse facts available," the International Trade Administration, U.S. Department of Commerce was referring to the use of "facts otherwise available" according to subsection (a) of section 776 of the Tariff Act of 1930, 19 U.S.C. § 1677e without the use of (continued…)

Commenting that the Department should use the CEP data to determine U.S. price, CPZ did not oppose the method Commerce used in the Second Remand Redetermination to redetermine the U.S. prices of its subject merchandise.  CPZ's Comments 2.  Defendant-intervenor Timken objected to the method, arguing that, in the circumstances of the review and the remand proceeding, it would have been preferable for Commerce to use adjusted entered values instead of the CEP information as the best available information from which to determine U.S. price.  Timken's Comments 5-6.  According to Timken, the entered values would have provided "a better measure of prices between CPZ and its importer."  *Id.* at 5.

Timken advocated the use of adjusted entered values as facts otherwise available in comments it submitted to Commerce on a draft version of the Second Remand Redetermination.  *See Second Remand Redetermination* 14 (citation omitted).  In the final version, Commerce rejected Timken's comment on the grounds that (1) the court's prior rulings did not permit the method Timken advocated and (2) unlike the use of the constructed export price method, the use of entered values is not a method of determining U.S. price recognized by the statute.  *Id.* at 15.  The court is not convinced by the Department's answer that use of entered values would violate the court's earlier rulings; the question of using entered values was not before the court, and therefore not considered, in *Peer Bearing II*.  However, the court agrees with the rationale that the use of CEP data would result in the determination of U.S. price by a method expressly recognized by the statute, whereas nothing in the statute contemplates that Commerce would determine U.S. price according to entered values.  Entered value under section 402 of the Tariff Act, 19 U.S.C. § 1401a, although in most cases determined according to the transaction value

_____

(…continued)
an adverse inference pursuant to subsection (b) of that section. *Final Results of Redetermination Pursuant to Ct. Remand* 10 (Oct. 2, 2012), ECF No. 124.

method of appraisement, is not the same as export price as determined according to section

772(a) of the Tariff Act, 19 U.S.C. § 1673a(a).  For these reasons, the court does not find error in

the Department's decision to use the record CEP data instead of entered value data to determine

the U.S. prices of CPZ's subject merchandise.

C.  Redetermined Surrogate Values

In the Second Remand Redetermination, Commerce chose new surrogate values for the

factors of production corresponding to CPZ's use of bearing-quality alloy steel wire rod,

bearing-quality alloy steel bar, and scrap by-product from the production of cages.  In the

comments it submitted to the court on the Second Remand Redetermination, Timken did not

address these new surrogate values, which the court, therefore, considers to be unopposed.  The

court has reviewed the new surrogate values and the supporting reasoning as set forth in the

Remand Redetermination and concludes that these redetermined surrogate values comply with

the remand order issued in *Peer Bearing I*.  The Department's decisions and reasoning are

summarized briefly below.

1.  Surrogate Value for Bearing-Quality Alloy Steel Wire Rod

The court concluded in *Peer Bearing I* that substantial evidence did not support the

Department's determination that certain Indian import data were, for purposes of

section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1), the "best available information"

with which to value CPZ's use of bearing-quality alloy steel wire rod.  *Peer Bearing I*, 35 CIT

at __, 752 F. Supp. 2d at 1371.  The court noted that the average unit value ("AUV") of $3,877

per metric ton shown by the Indian import data varied greatly from the AUVs shown by import

data from Indonesia ($1,184 per metric ton) and the Philippines ($1,327 per metric ton).  *Id.*

at __, 752 F. Supp. 2d at 1370-71.

In the Second Remand Redetermination, Commerce valued the steel wire rod input using

the import data for Indonesian HTS subheading 7228.50, which showed an AUV of $1,212.07

per metric ton.  *Second Remand Redetermination* 11-12.  Commerce reasoned that the

Indonesian and Philippine import data, like the Indian import data, satisfy the Department's

preference for information that is publicly available, contemporaneous with the POR,

tax-exclusive, and representative of significant quantities of imports.  *Id.* at 12.  Commerce also

concluded that, unlike the AUV derived from the Indian import data, the AUVs from the

Indonesian and Philippine import data corroborate one another and, when compared to the Indian

data, are considerably closer in value to the benchmark value established by U.S. import data,

which was $1,391 per metric ton.  *Id.* at 11.  Commerce chose the Indonesian import data over

the Philippine import data because the former were based on larger quantities and values and,

accordingly, were "more robust and representative of broader market averages."  *Id.* at 12.

### 2.  Surrogate Value for Bearing-Quality Alloy Steel Bar

In *Peer Bearing I*, the court rejected the Department's choice of data for determining a

surrogate value for CPZ's inputs of bearing-quality alloy steel bar, concluding that Commerce

did not explain why these data, which were import data for Indian HTS subheading 7228.50.90

with an AUV of $1,607 per metric ton, were the "best available information" for valuing the

factor of production as required by section 773(c)(1) of the Tariff Act, 19 U.S.C. § 1677b(c)(1).

*Peer Bearing I*, 35 CIT at __, 752 F. Supp. 2d at 1372-74.  The court observed that Commerce

gave no indication of having compared the Indian import data with the record import data

pertaining to Indonesia and the Philippines.  *Id.* at __, 752 F. Supp. 2d at 1373.

In the Second Remand Redetermination, Commerce valued the steel bar input using the

import data for Indonesian HTS subheading 7228.30, which showed an AUV of $970.04 per

metric ton.  *Second Remand Redetermination* 11-12.  Commerce gave reasons analogous to those

it gave for its choice of the steel wire rod surrogate value, including the rationale that the AUVs

obtained from the Indonesian and Philippine import data corroborated each other and were far

closer to the benchmark value obtained from U.S. import data ($1,040 per metric ton) than was

the AUV from the Indian import data.  *Id.* at 11.  Commerce again chose the Indonesian import

data over the Philippine import data because the former were based on larger quantities and

values and therefore "more robust and representative of broader market averages."  *Id.* at 12.

### 3.  Surrogate Value for Scrap from the Production of Cages

In *Peer Bearing I*, the court rejected the Department's surrogate value for scrap

by-product from cage production, which value was based on import data under an Indian HTS

subheading that differed from the Indian HTS subheading upon which the Department had based

the surrogate value in the preliminary results of the review and that did not appear to be the

correct subheading for the scrap under consideration.  *Peer Bearing I*, 35 CIT at __, 752 F. Supp.

2d at 1375-76.  In the Second Remand Redetermination, Commerce, upon re-evaluating the

record information, concluded that the subheading relied upon in the preliminary results (Indian

HTS subheading 7204.41) "is more specific to the by-product in question" and therefore "the

best available information pursuant to section 773(c)(1) of the Act," 19 U.S.C. § 1677b(c)(1).

*Second Remand Redetermination* 12-13.

### III. CONCLUSION

For the reasons set forth above, the court concludes that the Second Remand

Redetermination should be sustained.  Judgment will enter accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: August 30, 2013
         New York, New York